291 F.3d 111
 In Re: BOSTON REGIONAL MEDICAL CENTER, INC., Debtor.
Commonwealth of Massachusetts Division of Employment and Training, Appellant, Cross-Appellee,
v.
Boston Regional Medical Center, Inc., Official Committee of Unsecured Creditors, Appellees, Cross-Appellants.
 No. 01-9016.
 United States Court of Appeals, First Circuit.
 Heard March 6, 2002.
 Decided May 31, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Robert Ganong, Special Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, and Daniel J. Hammond, Assistant Attorney General, were on brief for appellant.
 Harold B. Murphy with whom D. Ethan Jeffery and Hanify & King were on brief for appellee.
 Before LYNCH, Circuit Judge, and CAMPBELL and BOWNES, Senior Circuit Judges.
 LYNCH, Circuit Judge.
 
 
 1
 This case involves a question of priorities for about three million dollars in unsecured debt owed by a bankrupt medical center. The Commonwealth of Massachusetts asserts it has priority to this sum as reimbursement for unemployment benefits it paid out to employees laid off after the bankruptcy. The estate of the medical center asserts that the Commonwealth has no priority but is in line with other unsecured creditors. The bankruptcy court and Bankruptcy Appellate Panel ("BAP") largely ruled against the Commonwealth. This issue is one of first impression at the circuit level. On different reasoning, we affirm the BAP's judgment.
 
 
 2
 The dispute between the parties concerns a three-million-dollar claim held by the Massachusetts Division of Employment and Training against the Boston Regional Medical Center. That claim arose because the Center had chosen to fulfill its obligations under Massachusetts's Employment and Training Law by reimbursing the Division for any unemployment compensation benefits paid to the Center's employees. Here, though, the payments were made to employees whom the Center laid off in large numbers shortly after filing a Chapter 11 petition, and were based on the employees' prepetition employment. The Division argues that this obligation is a tax under 11 U.S.C. § 507(a)(8) and, in substantial part, an administrative expense of the bankruptcy estate under 11 U.S.C. § 503(b). Either of these contentions, if accepted, would require the Center's bankruptcy estate to pay the Division before paying the Center's general unsecured creditors. The Center responds that the claim is not at all entitled to priority as being based on a tax, and only to a very small extent as an administrative expense. The bankruptcy court and the BAP both decided that the claim was based on a tax, but not a tax entitled to priority; they also gave priority to the claim as an administrative expense only to the small extent suggested by the Center. We hold that the claim is not based on a tax, and that the bankruptcy court and the BAP correctly determined the amount of the claim that is an administrative expense.
 
 I.
 
 3
 The parties submitted this case to the bankruptcy court on stipulated facts, which we summarize briefly and place in their legal context. The nonprofit[1] Boston Regional Medical Center, which was formerly known as the New England Sanitarium and Benevolent Association and did business as New England Memorial Hospital, filed a voluntary petition under Chapter 11 of the Bankruptcy Code on February 4, 1999. At that time, the Center had the capacity to admit up to 195 patients and employed 1262 people. Prior to filing, it had laid off a few employees and had ceased to admit patients. Within two weeks after filing, the Center (acting as debtor-in-possession) terminated 1124 employees, and by the end of the first quarter of 1999, an additional 68. In the second quarter, it terminated another 29; in the third, 4; in the fourth, 1; and in the first quarter of 2000, 33.
 
 
 4
 Some of those who lost their jobs collected unemployment insurance from the Commonwealth, as provided by federal and Massachusetts law. See generally Federal Unemployment Tax Act, 26 U.S.C. §§ 3301-3311 (2000); Employment and Training Law, Mass. Gen. Laws ch. 151A (2000). Under the Commonwealth's Employment and Training Law, applicants' benefits typically depend upon their salaries for each of the last four complete quarters they work. Mass. Gen. Laws ch. 151A, §§ 1(a), 29. Thus, the employees laid off in the first quarter of 1999 or earlier received benefits based solely on prepetition work; those laid off in the second quarter of 1999 or later received benefits based in part on prepetition work and in part on postpetition work. Because the Center laid off the vast majority of its employees in the first quarter of 1999, most relevant benefit payments were based solely on prepetition work, and most of the others were based at least in part on prepetition work.
 
 
 5
 For-profit employers within the Commonwealth must make regular contributions to the Commonwealth's Unemployment Compensation Fund based on a percentage of the wages they pay. Mass. Gen. Laws ch. 151A, § 14. Nonprofit employers have the option instead to make "payments in lieu of contributions," reimbursing the fund after the fact for benefits paid to their former employees. Id. § 14A. The Center's predecessor, the New England Sanitarium and Benevolent Association, in 1972 chose the option to pay after-the-fact reimbursement, and the Center adhered to that choice. As a result, following its massive layoffs in the first quarter of 1999, it became liable to the Division for the unemployment insurance benefits paid to the employees laid off.
 
 
 6
 Those payments were substantial. The parties agree that as of January 2001 the Division's valid claims for reimbursement of benefits paid to former Center employees amounted to $ 3,050,857. The Division timely filed its claims and amended its postpetition claim several times as it continued to pay out unemployment benefits and the Center's liability mounted. The only question now is at what priority, if any, and so to what extent, the Division will receive payment on its claims.
 
 
 7
 Before the bankruptcy court, the Division took the position that its claims fell into two categories: first, a priority claim for a tax on wages under 11 U.S.C. § 507(a)(8)(D) for the relatively small liability arising from the unemployment insurance benefits that the Division paid before the date of filing; second, an administrative expense claim for taxes incurred by the bankruptcy estate under §§ 507(a)(1) and 503(b) for the larger sum that the Division paid after the date of filing. The Center objected, arguing that: first, payments in lieu were not taxes under the Bankruptcy Code, and thus were within the scope of neither § 507(a)(8)(D) nor § 503(b)(1)(B); second, the Division's claims were not properly classified as administrative expenses because the classification turned not on when the Division paid the benefits, but on when the Center's employees had done the work that entitled them to those benefits.
 
 
 8
 On December 4, 2000, the bankruptcy court ruled largely for the Center. In re Boston Reg'l Med. Ctr., 256 B.R. 212 (Bankr.D.Mass.2000). It concluded that payments in lieu met the general criteria established for taxes by courts interpreting the Bankruptcy Code, relying on the decisions of the Ninth Circuit in County Sanitation District No. 2 v. Lorber Industries of California, Inc. (In re Lorber Industries of California, Inc.), 675 F.2d 1062 (9th Cir.1982), and of the Sixth Circuit in Ohio Bureau of Workers' Compensation v. Yoder (In re Suburban Motor Freight, Inc.), 36 F.3d 484 (6th Cir.1994) [hereinafter Suburban II]. Boston Reg'l, 256 B.R. at 220, 225. It further concluded, however, that those payments did not qualify as taxes "on ... wage[s], salar[ies], or commission[s]" within the meaning of § 507(a)(8)(D), because they were insufficiently closely linked to wages in amount and time and because they were contingent on occurrences other than the payment of wages. Id. at 225-27. As to the Division's argument that the wages were administrative expenses, the court agreed with the Center's reasoning that the key question of timing was whether the employment used to calculate the unemployment insurance benefits that gave rise to the obligation to make payments occurred before or after the Center's filing date. Id. at 227-29. The parties then stipulated that under the court's ruling, as of January 2001, the Division had a general unsecured claim of $2,961,374 and an administrative claim of $89,483.
 
 
 9
 The Division appealed to the BAP, and the Center cross-appealed. On August 27, 2001, the BAP affirmed. Mass. Div. of Employment & Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.), 265 B.R. 838 (BAP 1st Cir.2001). Its reasoning was generally similar to that of the bankruptcy court. It agreed that payments in lieu were taxes, although it considered the controlling precedent to be United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), rather than Lorber or Suburban II; it also agreed that those payments were not taxes on wages under § 507(a)(8)(D), and it agreed with the bankruptcy court's allocation of the payments as pre-and postpetition depending on the date of the work that gave rise to the payments. Id. at 848-53. It rejected the Division's alternative argument that the payments were excise taxes under § 507(a)(8)(E) because the Division had not presented that argument to the bankruptcy court. Id. at 847-48. This appeal followed. The parties substantially renew the arguments we have described,[2] with the addition of the new dispute about whether the Division waived its argument based on § 507(a)(8)(E).
 
 II.
 
 10
 This case involves the intersection of two federal statutes and of the policies they further. The first statute is the Federal Unemployment Tax Act, 26 U.S.C. §§ 3301-3311. We review the functioning of that Act, because our inquiry depends on its functional characteristics and those of the corresponding state law. The Act imposes on most American employers a tax calculated as a percentage of wages paid to employees according to formulas contained in §§ 3301 and 3306. Under § 3302, however, any contribution made to a state's unemployment compensation fund serves as a credit against the federal tax. The federal government receives a portion of the total percentage to pay for the administration of the federal unemployment compensation system, but the majority goes to the state funds. The state funds, which must comply with requirements set forth in §§ 3302, 3303, 3304, and 3309, make payments to individuals who become unemployed through no fault of their own.
 
 
 11
 This case concerns in particular the requirements of § 3309. Under that section, a state unemployment compensation system must permit, but not require, a government or nonprofit employer to make payments in lieu. Those employers are in any event exempt from the federal tax under §§ 3306(c)(7) and (8). If an employer chooses to make payments in lieu, it is also exempt from the requirement to make contributions to the state unemployment compensation fund. Instead, it agrees to reimburse the fund for any unemployment compensation payments made to recipients based on the recipients' work for the employer.[3] Section 3309(a)(2)[4] authorizes the states to take measures to ensure that employers making payments in lieu will meet their obligations. Massachusetts's Employment and Training Law provides that the Commissioner of Employment and Training has discretion to require a nonprofit employer to file a surety bond as a condition of making payments in lieu of contribution. Mass. Gen. Laws ch. 151A, § 14A(e).[5] At oral argument, counsel for the Division stated that the Commissioner has declined to do so as a matter of public policy. Thus, the Commonwealth could have provided itself with some security here, but chose not to do so.
 
 
 12
 The contribution required of an employer to Massachusetts's unemployment compensation fund is generally designed to vary, over time, with the value of compensation payments attributable to that employer. The contribution is calculated using a system called experience rating, which takes into account the amount of past payments attributable to that employer. See Mass. Gen. Laws ch. 151A, § 14(i). See generally R. Tannenwald & C. O'Leary, Unemployment Insurance Policy in New England: Background and Issues 10-12 (1997) (describing the experience rating system), available at http://www.upjohninst.org/publications/wp/ 97-49.pdf.
 
 
 13
 In addition to accounts for individual employers, which are used to calculate experience ratings, the fund also contains a solvency account to pay for benefits not attributable to individual employers, as well as benefits other than unemployment compensation provided through the fund, such as training. See Mass. Gen. Laws ch. 151A, §§ 14(c), 14(e); see also, e.g., id. § 30(c). See generally Tannenwald & O'Leary, supra, 13-25 (describing the ways in which New England's unemployment insurance systems fall short of perfect correspondence between the contributions of an employer and the payments made because of that employer). The fund also needs an extra margin for solvency because, as this case demonstrates, employers do not always fully satisfy their obligations, whether those obligations come in the form of contributions or that of payments in lieu. All employers making contributions bear some part of these extra costs.
 
 
 14
 Because of §§ 3306(c)(7) and (8), a nonprofit or governmental employer does not contribute towards the costs of administering the federal system. As to the state system, if it chooses to make contributions, it does pay towards the costs of administering that system, including the costs of the extra margin for solvency. If, however, it chooses to make payments in lieu, it does not pay the administrative or solvency costs — instead, its required payment is simply the value of compensation payments attributable to it, less any federal reimbursement. See Mass. Gen. Laws ch. 151A, § 14A(f).
 
 
 15
 The disadvantage to the nonprofit employer of this choice is that if the nonprofit then lays off large numbers of workers within a given year, it is subject to the full actual costs of the unemployment insurance benefits of those workers. Those costs can far exceed in a given year what its required contribution based on its experience rating would have been. Even so, it is not responsible for the cost of ensuring the fund's solvency. The nonprofit employer choosing payments in lieu is choosing to self-insure and bear its own risk. Indeed, the relevant federal legislative history refers to this option as the option to self-insure. See S.Rep. No. 91-752 (1970), reprinted in 1970 U.S.C.C.A.N. 3606, 3618 ("In effect, the nonprofit organizations would be allowed to adopt a form of self-insurance.").
 
 
 16
 The second statute involved in this case is the Bankruptcy Code. Section 507(a)(1) of the Code assigns priority to the administrative expenses of the bankruptcy estate. Section 503(b)[6] defines administrative expenses, which include the costs of preserving the bankruptcy estate and taxes incurred by the estate. Section 507(a)(8)[7] assigns priority in payment to several types of taxes, whether owed to the federal or state government. Claims under either § 507(a)(1) or § 507(a)(8) precede general unsecured claims. Whether a claim receives priority often determines whether, and to what extent, the claim will be paid. In this case, the Division is arguing that some of its claims should receive priority under § 507(a)(1), and others receive priority under § 507(a)(8), so that it should be paid ahead of the Center's general unsecured creditors.
 
 III.
 
 17
 This appeal presents only questions of statutory interpretation, as the parties have stipulated to the facts. We defer neither to the bankruptcy court nor to the BAP, instead reading the relevant statutes de novo. See Travelers Ins. Co. v. Cambridge Meridian Group, Inc. (In re Erin Food Servs., Inc.), 980 F.2d 792, 799 (1st Cir.1992).
 
 A. Section 507(a)(8) and Taxes
 
 18
 The first question presented is whether these payments in lieu are "tax[es]" within the meaning of § 507(a)(8) of the Bankruptcy Code. This question is close; we hold that they are not. Because we ground our decision on this initial point, we do not consider whether, if a tax, a payment in lieu might be a tax "on a wage, salary, or commission" within the meaning of § 507(a)(8)(D), or an "excise" tax within the meaning of § 507(a)(8)(E), or whether some other subsection of § 507(a)(8) might apply. Similarly, we do not decide whether the BAP correctly held that the Division waived or forfeited any argument based on § 507(a)(8)(E).[8]
 
 
 19
 We first examine the statutory text. That text is unhelpful, as the Bankruptcy Code does not define the word "tax." The legislative history also provides little assistance, although the report on the Senate's version of the bill does comment that the bill's reference to taxes "which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity" includes "Federal unemployment insurance." S.Rep. No. 95-989, at 71 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5857. This comment presumably refers to the language that eventually became 11 U.S.C. § 507(a)(8)(C), which refers to "a tax required to be collected or withheld and for which the debtor is liable in whatever capacity." It is not conclusive, however, because a mention of federal unemployment insurance, the liability imposed by 26 U.S.C. § 3301, does not necessarily include contributions to state unemployment funds, for which a taxpayer may receive credit under § 3302 — much less the payments in lieu of those contributions on which this case focuses.
 
 
 20
 There is, however, substantial federal precedent concerning the definition of a tax in federal bankruptcy law. Some of the relevant cases were decided under the prior Bankruptcy Act, and some under the 1978 Code that remains in force for the events in question. When Congress wrote the 1978 Bankruptcy Code, it legislated against the background of existing bankruptcy law. Without textual evidence that Congress intended to change the law, pre-1978 precedent remains persuasive to courts interpreting the Code. See Dewsnup v. Timm, 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) ("When Congress amends the bankruptcy laws, it does not write `on a clean slate.'" (quoting Emil v. Hanley, 318 U.S. 515, 521, 63 S.Ct. 687, 87 L.Ed. 954 (1943))); United States v. Yellin (In re Weinstein), 272 F.3d 39, 44 (1st Cir.2001). Because the Code contains no language defining a tax under federal bankruptcy law, we look to precedent from before and after 1978 in our analysis, as the Supreme Court has recently done. See CF & I, 518 U.S. at 220-22, 116 S.Ct. 2106.
 
 
 21
 As an initial matter, whether an obligation imposed by state law receives priority as a tax under the Bankruptcy Code is a matter of federal, not state, law. New Jersey v. Anderson, 203 U.S. 483, 491-92, 27 S.Ct. 137, 51 L.Ed. 284 (1906). Further, we must examine the functions of the law that imposes the obligation rather than the label given the obligation. CF & I, 518 U.S. at 224, 116 S.Ct. 2106. In performing that functional analysis, the Supreme Court has particularly distinguished a tax from a debt or a penalty. A tax, within this framework, is "a pecuniary burden laid upon individuals or property for the purpose of supporting the Government." Id. (quoting Anderson, 203 U.S. at 492, 27 S.Ct. 137).[9] Although the Court in CF & I did not expressly define a debt, its earlier cases make clear that in this context a debt is an "obligation[] for the payment of money founded upon contract, express or implied." Anderson, 203 U.S. at 492, 27 S.Ct. 137 (quoting Meriwether v. Garrett, 102 U.S. 472, 513, 26 L.Ed. 197 (1880)). These three categories do not appear to cover all possible claims held by governmental entities in bankruptcy proceedings. For example, in Lorber,[10] the Ninth Circuit classified a charge based on the debtor's discharge of large quantities of industrial wastewater as a fee, rather than as a tax. 675 F.2d at 1067; see also Sec'y of Labor and Indus. v. Epp (In re Wm. Akers, Jr., Co.), 121 F.2d 846, 849 (3d Cir.1941) ("There are, at least, three other forms of governmental exaction which have been held not to be taxes. We refer to fees or assessments for special services or benefits, penalties for ... socially undesirable acts and finally the regulatory expropriation of money from one group to another.").
 
 
 22
 Moving from the general to the specific, we consider various cases that have determined whether to assign priority to unemployment insurance contributions and to similar obligations. This circuit held, for example, that workers' compensation premiums were taxes under the prior Bankruptcy Act in In re Pan American Paper Mills, Inc., 618 F.2d 159, 162-63 (1st Cir. 1980). The Fourth and Sixth Circuits have held that workers' compensation premiums are excise taxes under § 507(a)(8)(E) of the present Code. New Neighborhoods, Inc. v. W. Va. Workers' Comp. Fund, 886 F.2d 714 (4th Cir.1989); Yoder v. Ohio Bureau of Workers' Comp. (In re Suburban Motor Freight), 998 F.2d 338 (6th Cir.1993) [hereinafter Suburban I]. The Sixth Circuit later held, however, that the obligation of an employer to reimburse the state after the fact for payments made to injured workers was neither an excise tax under § 507(a)(8)(E) nor a penalty in compensation for actual pecuniary loss under § 507(a)(8)(G), another potential source of priority. Suburban II, 36 F.3d at 487-90. Moreover, several courts have held that unemployment insurance contributions are taxes within the meaning of the Code. See 4 Collier on Bankruptcy ¶ 507.10[5] n. 55 (L. King et al. eds., 15th ed.2001) (collecting cases).[11] None of these circuit cases deal with payments in lieu of contributions made by nonprofit employers in the unemployment insurance system. In the only reported decision to address whether payments in lieu should be considered taxes under any of the subdivisions of § 507(a)(8), the Eastern District of Pennsylvania held that such payments were excise taxes. Sacred Heart Hosp. v. Pa. Dep't of Labor & Indus. (In re Sacred Heart Hosp.), 209 B.R. 650 (E.D.Pa.1997).
 
 
 23
 Within the framework established by precedent, it could be argued that payments in lieu should be called taxes. This argument characterizes state law as imposing on every employer the unconditional obligation to pay the state for the unemployment benefits that the employer's former employees receive. Some employers must do so on a prospective basis, through the contribution system; others, including nonprofits such as the Center, have the option of meeting their obligations through retrospective payments in lieu. If employers with the choice to make payments in lieu pay, on average, a somewhat lower tax, that distinction does not make a difference, according to the argument, which concludes that the obligation remains the same and only the means of paying it changes. This was the view adopted by the bankruptcy court, Boston Reg'l, 256 B.R. at 221-24, and by the BAP, Boston Reg'l, 265 B.R. at 846, and advocated here by the Division. It was also adopted by the Eastern District of Pennsylvania in Sacred Heart Hospital. See 209 B.R. at 658 ("[T]he government claim against Sacred Heart arises out of an obligation that is imposed on all employers....").
 
 
 24
 Nevertheless, the framework is also flexible enough that the obligation to make payments in lieu may easily be called something other than a tax. This is true even if we assume that prospective contributions, such as those paid by all for-profit employers, are taxes. That is because the two obligations, prospective contributions and retrospective payments in lieu, differ in an important way. Employers who make contributions not only pay the expected value of payments attributable to them, but also cover a share of the costs of administering the system, of supplying additional benefits such as training, and of keeping the system solvent despite others' defaults. Employers who make payments in lieu reimburse the fund for payments attributable to them, but not for administrative costs, additional benefits, or the solvency margin. The distinction between the payments required to sustain a government undertaking as a whole and those required merely to compensate for the costs imposed by a particular participant[12] is significant. A "financial exaction[]" is a tax when, among other things, its "burden and benefit inure to the general public welfare, and ... it [does] not provide a discrete benefit to, or result from privileges claimed by, the payor." Suburban II, 36 F.3d at 488-89. Moreover, those nonprofit employers permitted by federal and state law to make the choice of payments in lieu are precisely those employers whom the Internal Revenue Code exempts from federal income tax. See 26 U.S.C. § 3309 (citing § 3306(c)(8), which in turn cites § 501(c)(3)).[13] Thus, the idea that a payment in lieu is not a tax, but instead a different kind of obligation that a nonprofit employer is permitted to assume in place of a tax, fits into the structure of the two congressionally enacted statutes relevant to this case.
 
 
 25
 What tips the scales in this case is the option that the Employment and Training Law and § 3309 give the Division to require a nonprofit employer to provide a surety bond. One of the important reasons for giving a special priority in bankruptcy to taxes is that the state and federal governments do not generally choose their tax debtors. "A taxing authority is given preferred treatment because it is an involuntary creditor of the debtor. It cannot choose its debtors, nor can it take security in advance of the time that taxes become due." H.R.Rep. No. 95-595, at 190 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6150; see In re Taylor, 81 F.3d 20, 23-24 (3d Cir.1996) (relying on this language in holding that the three-year period during which tax claims receive priority was tolled by the pending of a debtor's earlier bankruptcy proceeding); cf. United States v. Kimbell Foods, Inc., 440 U.S. 715, 734-36, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (discussing the government's status as an involuntary creditor and the resulting federal interest in a unique rule governing federal tax liens). A government may have potent enforcement measures, such as liens, at its disposal once it becomes aware of tax delinquencies. Nevertheless, these provisions operate after the fact, not before.
 
 
 26
 The government's inability to choose its debtors or take security is not the only reason for giving priority to taxes. Other reasons include the paramount importance of the government's interest in tax collection, the desire for fairness to different taxpayers by ensuring that each pays what he or she owes, and the interest of an individual debtor in paying debts that are not subject to discharge in bankruptcy before paying those that are. Yet the first reason is usually a strong reason, and the relative weakness of the Commonwealth's position on this issue, together with the other reasons to doubt that a payment in lieu should be treated as a tax, is decisive.[14]
 
 
 27
 The Commonwealth can protect itself in advance against unpaid payments in lieu, as it cannot against unpaid income taxes. If it cannot choose its debtors, it can at least choose whether to be a secured or an unsecured creditor. It has explained that its decision not to do so was a matter of public policy. The obvious reason for the policy is that declining to require a surety bond lowers the costs imposed upon nonprofit employers doing business in the Commonwealth. That is an entirely reasonable policy. To achieve that goal, the Commonwealth has accepted a greater risk that some payments in lieu of contribution will not be made when nonprofit employers become insolvent, creating a deficiency that must somehow be made up. At its core the question presented by this case is who shall bear the cost of making up that deficiency.
 
 
 28
 One possible answer is the Center's unsecured creditors. The other possible answer is the Commonwealth's unemployment fund (and through it the employers who make contributions to that fund, and to some extent the employees on whom the incidence of the contributions may in part fall). Because we have concluded that payments in lieu are not taxes, the burden will fall on the fund, as a consequence of the choice that the Commonwealth has made. This result makes better sense out of the entire statutory scheme, state and federal. It is appropriate that the Commissioner face the choice whether to impose a surety bond requirement on nonprofit employers based on his judgment about whether the solvency of the fund requires that protection. It would be less appropriate if he could instead impose the costs on the nonprofit's unsecured creditors, as would be the effect were we to hold that payments in lieu were taxes.[15]
 
 
 29
 We hold that payments in lieu are not taxes within the meaning of § 507(a)(8).
 
 
 30
 B. Section 503(b) and Administrative Expenses
 
 
 31
 The second question presented is whether the bankruptcy court and the BAP correctly concluded that the Center's obligation to make payments in lieu was a prepetition claim to the extent it arose from services rendered prepetition, and a postpetition administrative expense to the extent it arose from those rendered postpetition. This question is not close. The bankruptcy court and the BAP reached the correct result, although their rationale requires some slight modification in light of our first holding.
 
 
 32
 The Center's claims receive administrative expense priority if they are among "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). As the BAP stated, this circuit set forth a general rule for determining whether a claim is entitled to administrative expense status in Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950 (1st Cir.1976). That case interpreted nearly identical language in the prior Bankruptcy Act, and the parties have not argued that the 1978 Code changed the relevant law. In Mammoth Mart, the court wrote that "[f]or a claim in its entirety to be entitled to first [that is, administrative expense] priority ... the debt must arise from a transaction with the debtor-in-possession." Id. at 954. The most common example of such a claim is a contract to provide services for the debtor-in-possession, which qualifies for priority "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." Id. The justification for this rule is that the administrative priority is necessary to induce potential contractors to do business with the debtor-in-possession, which in turn is necessary to prevent the business from collapsing entirely with the filing.
 
 
 33
 The rule does, however, extend further than that particular justification. The Supreme Court held in Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), that a tort judgment against a receiver for actions within the scope of his authority (equivalent, using present terminology, to a debtor-in-possession or a Chapter 11 trustee acting on behalf of the bankruptcy estate) is an "actual and necessary cost" of preserving the estate and must be paid at administrative expense priority. Id. at 485, 88 S.Ct. 1759. The Court reasoned that a bankruptcy estate is operated for the benefit of its general creditors, and that those injured by the operation of the estate should be made whole before the creditors receive their own shares. Id. at 482-83, 88 S.Ct. 1759. This circuit has extended the rule of Reading Co. to cover a civil compensatory fine imposed in a state court nuisance action, see Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.), 755 F.2d 200, 202-03 (1st Cir.1985); costs incurred by a purchaser of contaminated property from the debtor-in-possession for which the debtor-in-possession was liable under federal environmental law, see Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.), 993 F.2d 915, 935 (1st Cir.1993); and penalties imposed by state environmental law, see Cumberland Farms, Inc. v. Fla. Dep't of Envt'l Prot., 116 F.3d 16, 19-21 (1st Cir.1997). In so doing, the circuit has relied on the Supreme Court's statement in Reading Co. that "`actual and necessary costs' should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." 391 U.S. at 483, 88 S.Ct. 1759, quoted in Cumberland Farms, 116 F.3d at 20. Payments in lieu are costs incident to operation of a business — or, at least, to operation of a nonprofit organization that has not chosen to make contributions. They fit within the scope of § 503(b)(1)(A).
 
 
 34
 A slightly more complex question is which payments in lieu are costs incident to the operation of the bankruptcy estate. The Division argues that all payments in lieu required to reimburse the state fund for unemployment compensation paid after the petition should receive administrative expense priority. The Center defends the reasoning of the bankruptcy court and the BAP, which both concluded that payments in lieu should receive administrative expense priority to the extent, but only to the extent, that they reimburse the fund for unemployment compensation paid on the basis of work done after the petition. We take the latter view. Employees of the Center would still have received unemployment compensation based on their prepetition work even had the Center shut down entirely the day of filing. They could receive unemployment compensation based on their postpetition work only if the Center continued to operate after filing. Therefore, payments in lieu for compensation paid based on prepetition work are not incident to the operation of the Center as debtor-in-possession, while those for compensation paid based on postpetition work are. This is the same result that the bankruptcy court and the BAP reached, with the exception that we look to § 503(b)(1)(A) rather than to § 503(b)(1)(B).[16]
 
 
 35
 We deal briefly with two additional arguments raised by the Division. First, the Division claims that under applicable Massachusetts law the bankruptcy estate is the successor to the Center, and so the Center's prepetition obligations to make payments in lieu should receive the same treatment as the estate's other obligations. See Mass. Gen. Laws ch. 151A, § 1(j) (including within the definition of "employing unit" the "trustee in bankruptcy" of a "corporation"); id. § 8(g) (subjecting to the statute an employing unit who takes control of a business under the designation of a court and continues to employ its employees). We do not think it clear that the language of the statute stretches as far as the Division would take it. Although the Employment and Training Law provides that the Center's bankruptcy estate must make the payments in lieu that the Center would have made, it does not say at what priority the estate must make those payments. Further, to the extent that we were to read the Employment and Training Law to require that the Division receive administrative expense priority for a claim that the Bankruptcy Code would assign general unsecured status, the state law would then be inconsistent with federal law and so preempted. See Patriot Portfolio, LLC v. Weinstein (In re Weinstein), 164 F.3d 677, 683-84 (1st Cir.1999) ("[S]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations." (quoting Int'l Shoe Co. v. Pinkus, 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929))). The application of the doctrine of preemption is often complex, but in such a case would be clear-cut.
 
 
 36
 Second, the Division claims that concerns of fundamental fairness and public policy require that its claims receive administrative expense priority more broadly than the judgments of the bankruptcy court and BAP allow. It is true that the rule of Reading Co. rests on concerns of fundamental fairness. Specifically, the Supreme Court held in that case that it would be fundamentally unfair to pay the general creditors of a bankrupt debtor before satisfying the tort claims of one injured by the bankruptcy estate, because the estate is operated for the benefit of the general creditors. 391 U.S. at 477-79, 88 S.Ct. 1759. It is also true that this circuit's extension of Reading Co. has relied on concerns of public policy, and has attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation. Cumberland Farms, 116 F.3d at 21. In this case, however, for the reasons we have discussed, the relevant activity was the Center's employment of over a thousand people, not the bankruptcy estate's termination of those people. Our result today is consistent with this circuit's precedent. If the Division is arguing that today's result is so unfair or so inexpedient as to require us to develop a new rule that would look past the distinction, basic to bankruptcy, between the debtor's prepetition expenses and the bankruptcy estate's postpetition expenses — a distinction preserved by Reading Co. and our subsequent cases — we disagree.
 
 
 37
 We therefore hold that the Division's claims are entitled to administrative expense priority so far as, but no further than, the claims are for reimbursement for unemployment compensation paid on the basis of work done by employees after the filing of the Center's petition.
 
 IV.
 
 38
 Our two holdings in this case have both required us to interpret the Bankruptcy Code. The first, and more difficult, of the two also required us to interpret the Federal Unemployment Tax Act and to some extent Massachusetts's Employment and Training Law. To achieve the best reading of these statutes we have looked to long-standing precedent and, in addition, to the interaction of multiple federal and state policies. After doing so we have concluded that none of the Division's claims should receive priority under 11 U.S.C. § 507(a)(8). We have concluded as well that only those claims that are for reimbursement for unemployment compensation provided as a result of postpetition employment should receive priority under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1). Although our reasoning differs from that of the bankruptcy court and the BAP, the result is the same. The judgment of the Bankruptcy Appellate Panel is affirmed. No costs are awarded.
 
 
 
 Notes:
 
 
 [1]
 We use "nonprofit" as shorthand for "organized and operated exclusively for religious, charitable, scientific, ... educational," or other enumerated purposes within the meaning of 26 U.S.C. § 501(c)(3), indicating an organization exempt from the federal income tax
 
 
 [2]
 The Center filed a cross-appeal, which it identifies in its brief as an appeal from the BAP's "holding that payments in lieu of contributions constitute a tax within the meaning of 11 U.S.C. § 507(a)(8)." Appeals are properly taken from judgments, not holdings; what the Center apparently wants is to argue an alternate ground for affirmance. That does not require a cross-appeal. Through its cross-appeal it apparently also wants to challenge the small amount that the bankruptcy court did order to be paid as administrative expenses. That does require a cross-appeal. On the assumption that the Center meant to appeal that part of the judgment, we reject its arguments to that effect in Part III
 
 
 [3]
 If the federal government reimburses the state fund for compensation payments, as Congress sometimes does when extending the duration of unemployment compensation during a recession, the employer need not make payments in lieu to cover the federally paid amounts. Mass. Gen. Laws ch. 151A, § 14A(a)
 
 
 [4]
 That subsection provides in relevant part that state unemployment compensation laws "may provide safeguards to ensure that governmental entities or other organizations so electing will make the payments required under such elections." 26 U.S.C. § 3309(a)(2)
 
 
 [5]
 That subsection provides in relevant part that
 [i]n the discretion of the commissioner, any nonprofit organization that elects to become liable for payments in lieu of contributions may be required within thirty days after the effective date of its election, to execute and file with the commissioner a surety bond approved by him. The maximum amount of such surety bond shall not exceed a percentage of the employer's taxable payroll equal to the maximum rate that any employer, who is liable for contributions during the year in question would have to pay under the provisions of section fourteen of this chapter.
 Mass. Gen. Laws ch. 151A, § 14A(e) (2000). In 1999, for instance, the relevant maximum would have been 7.225%. See Mass. Div. of Employment & Training, Contribution Information for Year 2002, at http://www.detma.org/revenue/2002rates.htm (last updated Dec. 21, 2001) (identifying the relevant statutory rate table for 1999 as table B); Mass. Gen. Laws ch. 151A, § 14(i) (2000) (giving the maximum rate for table B as 7.225%).
 
 
 [6]
 That subsection provides in relevant part that
 [a]fter notice and a hearing, there shall be allowed, administrative expenses ... including —
 (1) (A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; [and]
 (B) any tax —
 (i) incurred by the estate....
 11 U.S.C. § 503(b) (2000).
 
 
 [7]
 That subsection accords priority to
 allowed unsecured claims of governmental units, only to the extent that such claims are for —
 (A) a tax on or measured by income or gross receipts ...;
 (B) a property tax assessed before the commencement of the case ...;
 (C) a tax required to be collected or withheld and for which the debtor is liable in whatever capacity;
 (D) an employment tax on a wage, salary, or commission ...;
 (E) an excise tax ...;
 (F) a customs duty arising out of the importation of merchandise ...; or
 (G) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss.
 11 U.S.C. § 507(a)(8) (2000).
 
 
 [8]
 We have some doubts about the forfeiture analysis of the BAP. The Division and the Center stipulated that among the legal issues raised by the case was "[w]hether the amount claimed to be due under the Pre-Petition Reimbursement Claim constitutes a `tax' under Section 507(a)(8)(D) of the Bankruptcy Code." The Division then filed a brief discussing § 507(a)(8)(D), apparently under the assumption that this question was equivalent to that whether the amount was a tax within the meaning of § 507(a)(8). The Center responded almost entirely in kind; a single footnote of its brief argued in the alternative that a payment in lieu, if a tax, was not a tax "on a wage," language specific to subsection (D), and that the Division had not argued that it might be an "excise" tax, language specific to subsection (E). The bankruptcy court then rested its decision on that point, saying that the Division had raised no arguments based on subsection (E)Boston Reg'l, 256 B.R. at 225-26 & n. 9. The BAP agreed. Boston Reg'l, 265 B.R. at 847-48. The Division might have done better to file a response to the Center's footnoted argument. Nevertheless, we think the Division can legitimately say it was taken by surprise, and that the bankruptcy court and the BAP should have reached the merits.
 
 
 [9]
 A penalty, by contrast, is "an exaction imposed by statute as punishment for an unlawful act."CF & I, 518 U.S. at 224, 116 S.Ct. 2106 (quoting United States v. LaFranca, 282 U.S. 568, 572, 51 S.Ct. 278, 75 L.Ed. 551 (1931)).
 
 
 [10]
 The BAP treatedAnderson and City of New York v. Feiring, 313 U.S. 283, 61 S.Ct. 1028, 85 L.Ed. 1333 (1943), on the one hand, and Lorber and the two Suburban cases on the other, as developing different and apparently mutually exclusive tests. It then concluded that the Supreme Court had chosen the former test rather than the latter in CF & I. See Boston Reg'l, 265 B.R. at 845. We consider Lorber and the Suburban cases to be refinements of the law generated in Anderson and Feiring, which remain persuasive to although not binding on this court after CF & I. We share, however, the Sixth Circuit's concern in Suburban II that the analysis set forth in Lorber considered by itself is incomplete and one-sided, and may lead to incorrect results. See Suburban II, 36 F.3d at 488-89; see also Indus. Comm'n v. Camilli (In re Camilli), 94 F.3d 1330, 1333-34 (9th Cir.1996) (holding the Suburban cases consistent with Lorber and following the Sixth Circuit's reasoning).
 
 
 [11]
 The Center concedes in its brief that unemployment insurance contributions due from for-profit employers "appear to meet all the requirements of a tax."
 
 
 [12]
 For this reason, we also consider it significant that the employer escapes liability if the fund receives reimbursement from Congress. Mass. Gen. Laws ch. 151A, § 14A(a)
 
 
 [13]
 Similarly, the governmental employers permitted to make payments in lieu are those constitutionally exempt from federal taxesSee 26 U.S.C. § 3309 (citing § 3306(c)(7)).
 
 
 [14]
 The bankruptcy court commented that the government's inabilities, in the tax context, to choose its debtors and to obtain advance security, were "reasons for Congress's assignment of priority to taxes, not ... necessary incidents of taxes."Boston Reg'l, 256 B.R. at 221 (citing Sacred Heart Hospital, 209 B.R. 650). We do not hold that the availability of a surety bond, as in this case, would alone be sufficient to render an obligation not a tax. Instead, when combined with the other reasons, which we have discussed, to doubt that payments in lieu are taxes, it is the decisive factor.
 
 
 [15]
 The Division apparently did not have statutory authority to require a bond as large as the Center's actual debt in this case. As described in Part II, the Division in 1999 could at most have required the Center to post a bond of up to 7.225% of the Center's taxable payroll. While the Center's taxable payroll is not part of the record, it was probably in the area of $13.6 million (no more than $10,800 for each of approximately 1262 employees,see Mass. Gen. Laws ch. 151A, § 14(a)(4) (2000)), so that the bond could not have exceeded $1 million. Our discussion of the policy choice made by the Commissioner when he decided not to take any security for the Center's obligation, however, applies equally well to the policy choice made by Massachusetts's legislature when it limited the Commissioner's ability to do so.
 
 
 [16]
 A footnote in the Center's brief says that the Division has waived any reliance on § 503(b)(1)(A). Whether or not this is so, we rely on § 503(b)(1)(A) in affirming that portion of the BAP's judgment that gave administrative expense priority to a small amount of the Division's claim. Although with few exceptions we will not reverse a judgment on grounds raised for the first time on appeal, we may affirm on any ground supported by the recordDoe v. Anrig, 728 F.2d 30, 32 (1st Cir.1984).