**In re ALBION HEALTH SERVICES, d/b/a Trillium Health Alliance, d/b/a Trillium Hospital, Debtor.**

**No. HK 02–01745.**

United States Bankruptcy Court, W.D. Michigan.

March 16, 2006.

John T. Piggins, Esq., Grand Rapids, MI, for the Chapter 7 Trustee.

Thomas C. Johnson, Asst. Attorney General, Grand Rapids, MI, for MUIA.

### *OPINION RE; TRUSTEE'S OCTOBER 13, 2005 MOTION FOR SUMMARY JUDGMENT*

JEFFREY R. HUGHES, Bankruptcy Judge.

The State of Michigan has filed a claim for reimbursement of unemployment benefits paid to Albion Health Services' former

employees. The Chapter 7 Trustee has objected to the allowance of that claim as a tax priority. The Trustee's objection is SUSTAINED.

## PROCEDURAL BACKGROUND

The State of Michigan filed what it styled as a "Proof of Chapter 7 Administrative Expense Claim" on May 10, 2004. The state contends that a portion of its claim is entitled to administrative priority pursuant to 11 U.S.C. § 507(a)(2) and that the balance of its claim is entitled to tax priority pursuant to 11 U.S.C. § 507(a)(8).[1] The Chapter 7 Trustee has responded by objecting to both the priority and the amount claimed.

I first heard the Chapter 7 Trustee's objection on August 11, 2005. The parties agreed at the hearing that the priority issues should be resolved first and that the priority issues could be decided by motions for summary judgment. They also agreed that the Chapter 7 Trustee would file the motion for summary judgment on the Section 507(a)(8) tax priority issue and that the State of Michigan would file the motion for summary judgment on the Section 507(a)(2) administrative priority issue.

The Chapter 7 Trustee filed a timely motion.[2] Both parties filed briefs on the Section 507(a)(8) issue and the motion was heard on December 1, 2005. I took the matter under advisement at the conclusion of that hearing.

## FACTUAL BACKGROUND

There are no disputed facts with respect to whether the State of Michigan's claim

should be given Section 507(a)(8) priority status.

The State of Michigan maintains a fund for unemployed Michigan workers. Laid off employees from both for-profit and not-for-profit employers are eligible for benefits from the fund.

The State of Michigan finances its unemployment compensation fund by collecting quarterly "contributions" from businesses that employ Michigan workers. MICH. COMP. LAWS § 421.13. All for-profit businesses are required to make these contributions. However, a not-for-profit organization may elect not to contribute to the fund. A not-for-profit organization may choose instead to simply reimburse the State of Michigan for whatever unemployment claims are paid from the fund on account of its workers as the claims are paid. MICH. COMP. LAWS § 421.13a.

Albion Health Services ("Albion Health") is a not-for-profit corporation that owned a hospital in Albion, Michigan. Albion Health ceased operations early in 2002. It filed for relief under Chapter 7 of the Bankruptcy Code shortly thereafter.

Albion Health's cessation of business prompted a spate of claims against Michigan's unemployment compensation fund. The State of Michigan asserts that it has paid $456,765.93 in benefits to Albion Health's former employees for which it has not been reimbursed. The bulk of these allegedly unreimbursed benefits coincide with Albion Health's decision to terminate operations in 2002.

## DISCUSSION

"Equality of distribution among creditors is a central policy of the Bankruptcy

---

1. The Bankruptcy Code is set forth in 11 U.S.C. §§ 101–1532. Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

2. The State of Michigan did not file a timely motion. Consequently, the State of Michigan is barred from further asserting administrative priority with respect to its claim. *See,* August 15, 2005 Scheduling Order.

Code." *Begier v. Internal Revenue Service,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2262, 110 L.Ed.2d 46 (1990). However, equality of distribution is not the only policy, for the Bankruptcy Code also reflects the Orwellian notion that some creditors are "more equal than others." Consequently, the Bankruptcy Code provides that certain claims are to be paid in full before general unsecured claims are to be paid anything. *See, e.g.,* 11 U.S.C. § 726(a).

Section 507(a) lists the claimants who are entitled to priority treatment. Tax creditors have always been included among those who have enjoyed Congress' favor. 11 U.S.C. § 507(a)(8). *See, also,* 11 U.S.C. § 104 (repealed).

Granting priority to tax claims has raised the question of what exactly is a tax. There is general agreement that governmental assessments against income or against the sale of cigarettes are taxes within the meaning of Section 507(a)(8). However, governments also raise revenue through other means. Governments impose fines for unlawful behavior. Governments charge fees to engage in activities subject to public regulation. Governments even engage in commerce. The sale of logging rights and the collection of park fees are but two examples. Which of these other charges is also a tax for purposes of the Bankruptcy Code? More to the point, is the State of Michigan's right in the instant case to seek reimbursement from the bankruptcy estate for unemployment claims paid to Albion Health's former employees a tax entitled to priority under Section 507(a)(8) or is it just another general unsecured claim relegated to the back of the creditor line?

The First Circuit and the Third Circuit have addressed this specific issue. *Commonwealth of Massachusetts v. Boston Regional Medical Center, Inc. (In re Boston Regional Medical Center, Inc.),* 291 F.3d 111 (1st Cir.2002) and *The Reconstituted Committee of Unsecured Creditors v. State of New Jersey (In re United Healthcare System, Inc.),* 396 F.3d 247 (3rd Cir.2005). Both *Boston Regional* and *United Healthcare* involved bankrupt non-for-profit debtors who had "opted out" of making contributions to their respective state unemployment compensation funds. Consequently, the state in each of these cases had a substantial reimbursement claim against the debtor for unemployment benefits paid by the state on the debtor's behalf. The court in each case concluded that the state's reimbursement claim was not a "tax" within the meaning of Section 507(a)(8). Both courts employed what the court in *United Healthcare* characterized as a "functional examination" of the state's reimbursement claim to determine, on balance, whether the claim obligation resembled a tax or not. That is, each court looked behind whatever label the state had placed upon the claim to examine its "actual effects." *Boston Regional,* 291 F.3d at 122–124 and *United Healthcare,* 396 F.3d at 254–261.

The Sixth Circuit also has had the opportunity to consider the scope of Section 507(a)(8) in the context of contributions and reimbursements sought by the state with respect to a workers compensation fund. *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Freight, Inc.),* 998 F.2d 338 (6th Cir.1993) ("*Suburban I*") and *Ohio Bureau of Workers' Compensation v. Yoder (In re Suburban Freight, Inc.),* 36 F.3d 484 (6th Cir. 1994) ("*Suburban II*"). The court determined in both *Suburban I* and *Suburban II* that a governmental claim is entitled to Section 507(a)(8) tax priority only if it is:

(1) an involuntary pecuniary burden; (2) imposed by the state legislature; (3) for

a public purpose; (4) under the police or taxing power of the state.

*Suburban II,* 36 F.3d at 488.

The court also identified two other factors in *Suburban II:* (a) whether the obligation owed by the debtor was universally applicable to similarly situated entities; and (b) whether according priority treatment to the governmental claim would disadvantage private creditors with like claims. *Id.*

The courts in *Boston Regional* and *United Healthcare* recognized the six factors set forth in *Suburban I* and *Suburban II* as relevant to their functional examination of the state unemployment reimbursement claims before them. However, neither court limited its consideration to these factors.

While the *Lorber–Suburban* analysis is helpful in executing this examination, we do not believe that its six factors should constrain our inquiry. We believe a functional examination that balances the characteristics of the obligation at issue will signal whether an obligation is a tax for bankruptcy purposes, and that an examination should be flexible enough to allow for consideration of any relevant factor. The problem with applying only the *Lorber–Suburban* six-factor test is that it may prove too rigid to provide an effective analysis of every potential obligation and thus could preclude consideration of important characteristics. Also, by employing a functional examination we preempt the concern that the Court of Appeals for the Sixth Circuit expressed that the *Lorber* test produces overly broad classification of claims as taxes. Moreover, our more flexible approach allows us to consider the characteristics of the obligation in light of the evolving treatment of priority claims under the Bankruptcy Code. We emphasize, however, that the *Lorber* and *Sub-*

*urban* factors are helpful in undertaking this functional examination, and at times application of those factors alone sufficiently may answer the question whether a governmental obligation is a tax.

*United Healthcare,* 396 F.3d at 255–256.

■ The State of Michigan argues that *Boston Regional* and *United Healthcare* misinterpreted *Suburban I* and *Suburban II* and that *Suburban I* and *Suburban II* require me to consider only the six factors identified therein for purposes of evaluating its Section 507(a)(8) claim. However, the unanimous panel in *Suburban II* observed at the end of its opinion that:

> [T]he non-tax characteristics of Suburban's liability for reimbursement for claims payments predominate over its tax characteristics, and the Bureau's [state's] claim more closely resembles a subrogation claim than a universally applicable tax.

36 F.3d at 489.

This observation strongly suggests that the Sixth Circuit in *Suburban II* had in fact conducted a "functional examination" just as the First and Third Circuits had done later and that the court's reference to the six factors in *Suburban II* was intended to be only an illustration of what should be considered. Indeed, the Sixth Circuit has since adopted a similar functional approach in connection with determining the scope of nondischargeable support obligations under Section 523(a)(5). *See, Sorah v. Sorah (In re Sorah),* 163 F.3d 397 (6th Cir.1998) ("If something looks like a duck, walks like a duck, and quacks like a duck, it is probably a duck.").

■ The State of Michigan's reimbursement claim does have certain "tax" attributes. It is involuntary. It is imposed by the state legislature. It serves a public purpose. There is no alternative private

"provider" who might have a comparable claim.

However, there are other attributes of this claim which distinguish it from a tax. First, the law itself characterizes this obligation as a reimbursement claim, not a tax. The State of Michigan taxes, for example, all for-profit employers for their share of the unemployment compensation system by requiring them to make regular quarterly contributions to the fund. MICH. COMP. LAWS ANN. § 421.13. However, a not-for-profit employer has the option of not making these contributions. In the event it makes the election, the not-for-profit organization need only "make reimbursement payments" to the fund "in lieu of contributions [i.e., taxes]." MICH. COMP. LAWS § 421.13a. Indeed, a not-for-profit organization's right to exempt itself from this tax is not even at the pleasure of the State of Michigan. Rather, it is a federal right created by Congress in conjunction with its own effort to create a compensation system to benefit the unemployed. 26 U.S.C. § 3309(a)(2).[3]

Second, taxation is the exercise of legislative prerogative. However, in this instance there has been no exercise of that prerogative. The State of Michigan has no authority to make a regular assessment against an electing not-for-profit organization. Rather, the obligation to reimburse arises only when an employee's claim is paid. Moreover, the State of Michigan has no control over the amount of the reimbursement. The not-for-profit employer's obligation to the state is based solely upon whatever is paid from the fund on account of its employee's claim. In sharp contrast is the State of Michigan's assessment of the quarterly contribution against for-profit employers. In that instance, the state is clearly exercising its taxing authority by regularly charging an entity based upon a rate the state itself has set. See, MICH. COMP. LAWS § 421.13.

Indeed, the reimbursement obligation imposed upon an electing not-for-profit organization is not even designed to support the administration or liquidity of Michigan's unemployment compensation fund. That support is provided through the quarterly contributions paid by for-profit businesses and by not-for-profit organizations that have chosen to make contributions. Boston Regional, 291 F.3d at 118. All that is required of the electing not-for-profit organization is that it cover the cash outlay the fund has paid on its behalf. Consequently, the payments by the electing not-for-profit organization to the unemployment compensation fund resemble reimbursements by a self-insured employer to a plan administrator more than they resemble the imposition of a tax.

■ Granted, the electing not-for-profit employer has no control over a laid-off employee making a claim against the fund. However, an employer also has no choice as to whether an injured employee will make a claim against the employer's insur-

---

3. The federal exemption for non-profit organizations further provides that:

  The State law may provide safeguards to ensure that governmental entities or other organizations so electing will make the payments required under such elections.

  26 U.S.C. § 3309(a)(2).

  Such a provision would be unnecessary if, as the State of Michigan contends, the reimbursement payments are nothing more than an alternative method of assessing the contribution tax. The State of Michigan would simply utilize its existing system to collect unpaid taxes. Consequently, it is fair to conclude that Congress considered the "payments" that a non-profit organization could elect to make in lieu of contributions as something different from a tax and that, therefore, a separate set of safeguards (e.g., surety bond) would be necessary to ensure the collection of the same.

ance carrier under Michigan's workers compensation laws. Legislation frequently imposes costs upon a business that it otherwise might not incur. The minimum wage law is an example. However, not all such involuntary charges are taxes. That is the point of *Suburban II*. In this instance, the State of Michigan has adopted a system whereby not-for-profit organizations may avoid being taxed to support Michigan's unemployment compensation fund but still enjoy the benefit of its unemployed workers being able to draw from that fund. The only catch is that the electing not-for-profit employer must reimburse the fund for whatever the fund has paid on its account. There is no more resemblance to a "universally applicable tax" here than there was in *Suburban II*.

■ Moreover, even if the State of Michigan's reimbursement claim could be characterized as a tax, it does not follow that its claim is automatically entitled to priority treatment. The Bankruptcy Code, unlike the former Bankruptcy Act, does not give priority to all taxes imposed by a governmental unit.[4] Rather, Section 507(a)(8) is limited to only certain types of taxes: (A) taxes on or measured by income, (B) property taxes, (C) taxes collected or withheld by the debtor, (D) employment taxes, (E) excise taxes, and (F) customs duties.[5]

The State of Michigan asserts that its right to seek reimbursement is entitled to priority because it is an "excise tax" within the meaning of Section 507(a)(8)(E). However, not all excise taxes fall within the ambit of that subsection. The State of Michigan itself concedes that only excise taxes "on a transaction" are entitled to Section 507(a)(8)(E) priority.[6] *See, also, DeRoche v. Arizona Industrial Commission (In re DeRoche)*, 287 F.3d 751 (9th Cir.2002).

In *DeRoche*, an employee of the debtors was injured. However, the debtors did not carry workers compensation insurance as required by Arizona law. Consequently, the State of Arizona itself paid the injured employee's claim. It then sought reimbursement from the debtors together with penalties and interest.

The issue in *DeRoche* was not whether the State of Arizona's claim for reimbursement was an "excise tax" entitled to priority under Section 507(a)(8). The Ninth Circuit had already decided that such claims were a tax albeit it did so without considering the further requirement that the tax be assessed against a transaction. *See, Industrial Commission of Arizona v. Camilli (In re Camilli)*, 94 F.3d 1330 (9th Cir.1996).[7] Rather, the issue in *DeRoche* was whether the debtors were able to discharge that claim notwithstanding Section 523(a)(1).

A discharge under section . . .

(1) for a tax or custom duty—

---

**4.** The only taxes under the former Bankruptcy Act that were not entitled to priority were taxes which had become due more than three years before the debtor's bankruptcy and which otherwise fell outside several exceptions. 11 U.S.C. § 104(4) (repealed).

**5.** Section 523(a)(1) likewise limits non-dischargeability under that subsection to only "a tax" of the kind . . . specified in section . . . 507(a)(8). . ." 11 U.S.C. § 523(a)(1)(A) (emphasis added).

**6.** *See,* State of Michigan's November 10, 2005 response brief (Docket Entry No. 432).

**7.** In contrast, the Sixth Circuit had previously held in *Suburban II* that the State of Ohio's reimbursement claim against an employer was not an excise tax and therefore not entitled to Section 507(a)(8) priority. The court in *Camilli* reconciled its decision with *Suburban II* by noting differences in Arizona's and Ohio's workers compensation laws.

(A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed;

\*     \*     \*     \*     \*     \*

11 U.S.C. § 523(a)(1).

Consequently, the Ninth Circuit found itself in somewhat of an awkward position when the transaction issue unexpectedly arose in this different context. It was the debtors' position that the "taxable transaction" that gave rise to the State of Arizona's supposed "excise tax" for reimbursement occurred more than three years before the debtors' bankruptcy petition. Consequently, the debtors argued that the State of Arizona's reimbursement claim was not entitled to priority, 11 U.S.C. § 507(a)(8)(E)(ii), and, therefore, it was subject to the debtors' discharge.

The court in *DeRoche* clearly struggled as it attempted to identify the taxable transaction that gave rise to the State of Arizona's supposed excise tax against the debtors. It recognized that the issue before it was "difficult" because the State of Arizona's claim for reimbursement against the debtors was "an unusual excise tax." *DeRoche*, 287 F.3d at 755. It contrasted this "excise tax" with "[m]ore typical excise taxes" such as "taxes on the sale of cigarettes or license taxes." *Id.* These excise taxes, it observed, are based upon an "obvious" transaction. *Id.* Each involves " a discrete act by the person or entity being taxed—for example, the sale of cigarettes or the application for a license." *Id.*

On the other hand, the court in *DeRoche* observed that:

[t]he "transaction" in a workers' compensation case is less obvious. There are a number of events that, taken together, result in the ultimate assessment of the "excise tax" by the Special Fund. First, the employer must fail to carry workers' compensation insurance. Second, an employee must be injured. Third, the employee must make a claim for workers' compensation. Fourth, the Commission must make a determination that the worker is entitled to compensation. Fifth, the Fund must pay compensation to the injured worker. Finally, the Fund must assess the employer for reimbursement of the compensation paid to the worker. The assessment for reimbursement to the Fund, which comes at the end of this sequence of events, is the "excise tax" in question.

*Id.*

Nonetheless, the Ninth Circuit was able to find a taxable transaction under the Arizona workers compensation laws so as to validate its prior decision to afford Section 507(a)(8)(E) priority to the state's reimbursement claim. It concluded that the taxable transaction was "the act of employing a worker without carrying the required insurance when the worker is injured." *DeRoche*, 287 F.3d at 757. It further concluded that "[t]he date of the transaction is the date on which the worker is injured." *Id.*

There is no question that the term "excise tax" has been used to describe a broad range of charges assessed by governments against individuals and other entities. An excise tax is:

[a] tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege. *Rapa v. Haines*, Ohio Com.Pl., 101 N.E.2d 733, 735. A tax on the manufacture, sale, or use of goods or on the carrying on of an occupation or activity, or a tax on the transfer or property. **In current usage the term has been extended to include various license fees and practically every internal revenue tax except the income tax (*e.g.,* federal alcohol and**

tobacco excise taxes, IRC § 5001 et seq.)

Black's Law Dictionary (6th Edition) (emphasis added).[8]

Consequently, it is not surprising that the taxable event or transaction giving rise to the government's excise of a tax is also broadly defined. Put simply, a duly constituted governmental body has the right to generate tax revenue based upon virtually any discernable activity.

■ However, the task before me is not to decide under what authority does the State of Michigan have the right to recover unemployment benefits paid on behalf of a not-for-profit organization. It is given that the State of Michigan has that authority. My task is instead to determine whether the State of Michigan's right to seek reimbursement should be given priority over other rights to receive payment in connection with the administration of this bankruptcy estate. While it may be appropriate for a court to stretch and pull the meaning of "transaction" for purposes of determining whether a governmental entity has the right to exact payment from a citizen, I do not have the same latitude when asked to interpret Section 507(a)(8). Federal bankruptcy law controls my decision. *Suburban II*, 36 F.3d at 487. Moreover, the Sixth Circuit has ruled that Section 507(a)(8) is to be construed narrowly. "[C]reditors must directly tie their priority claims to specific provisions of the Bankruptcy Code." *Suburban I*, 998 F.2d at 342. "Thus, priority claims must be carefully limited since every such claim re-

duces the fund available to general creditors." *Suburban II*, 36 F.3d at 487.

Congress, of course, could have intended the term "transaction" as used in Section 507(a)(8)(E) to mean any activity subject to an excise tax. However, Section 507(a)(8) itself does not support such an interpretation. For example, unemployment taxes and other wage related assessments would easily fall within the scope of Section 507(a)(8)(E) if "transaction" is to be given this broad definition. Indeed, Congress itself characterizes employer contributions under the Federal Unemployment Tax Act as an excise tax. 26 U.S.C. § 3301. However, Section 507(a)(8)(D) already covers such FUTA contributions because they constitute "an employment tax on a wage, salary, or commission." Consequently, it is fair to conclude that Congress intended a narrower definition when it limited Section 507(a)(8)(E) to only excise taxes on a "transaction."

■ Words should be given their common ordinary meaning when interpreting statutes unless the context or legislative history directs otherwise. *Perrin v. U.S.*, 444 U.S. 37, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Webster's Third New International Dictionary (Unabridged) defines "transaction" as:

[A] communicative action or activity involving two parties or two things reciprocally affecting or influencing each other.

In the context of Section 507(a)(8), a "transaction" is a discrete activity, like the sale of cigarettes or the application for a license. *DeRoche*, 287 F.3d at 755. *See,*

---

8. Webster's Third New International Dictionary (Unabridged) defines an "excise tax" as:
... b: an internal tax, duty or impost levied upon the manufacture, sale, or consumption of a commodity within a country and usu. forming an indirect tax that falls on the ultimate consumer c: any of various duties

or fees levied on producers of excisable commodities d: any of various taxes upon privileges (as of engaging in a particular trade or sport, transferring property, or engaging in business in a corporate capacity) that are often assessed in the form of a license or other fee[.]

*also,* S.Rep. No.95–989 at 70 *reprinted in* 1978 U.S.C.C.A.N. 5787, 5856 ("Employment taxes and transfer taxes (including gift, estate, sales, use, and other excise taxes) are also given sixth priority . . . .").

The State of Michigan contends that its reimbursement claim against Albion Health is a Section 507(a)(8)(E) excise tax because it was taxing the payments made by the fund to Albion Health's employees made on its account. In other words, it argues that the taxable event was the transaction between the fund and the laid off employees. However, the state is extemporizing. Granted, the state has found a "transaction" to accommodate its position. However, Albion Health was not a party to any of these transactions. Albion Health neither paid nor received any of the benefits that exchanged hands in these transactions. Moreover, there is no suggestion whatsoever that the Michigan legislature identified this transaction as a taxable event upon which an excise tax was to be imposed. Indeed, the supposed "tax" is exactly the same amount as the transaction being "taxed." Consequently, I conclude that the State of Michigan has not established that its claim for reimbursement on account of unemployment benefits paid is an "excise tax on a transaction" within the meaning of Section 507(a)(8)(E).

### CONCLUSION

For the reasons stated, the Chapter 7 Trustee's motion for summary judgment is GRANTED. A separate order will enter that denies priority status to any portion of the State of Michigan's May 10, 2004 claim for $456,765.93. The court will also issue an amended scheduling order with respect to the Chapter 7 Trustee's remaining objection concerning the amount of that claim.