# United States Court of Appeals

## For the First Circuit

No. 03-1527

IN RE   BOSTON REGIONAL MEDICAL CENTER, INC.

Debtor, Appellant,

v.

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF HEALTH CARE FINANCE AND POLICY,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Howard, Circuit Judge,

Campbell and Stahl, Senior Circuit Judges.

Harold B. Murphy with whom D. Ethan Jeffery and Hanify & King were on brief for appellant.
James J. Arguin, Assistant Attorney General, Office of the Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief for appellee.

April 14, 2004

**CAMPBELL**, <u>Senior Circuit Judge</u>.  At issue in this appeal is whether amounts owing by a debtor hospital under Massachusetts general law, chapter 118G, section 18, to a state fund known as the Commonwealth's Uncompensated Care Pool are properly considered to be "excise taxes" enjoying priority in bankruptcy under 11 U.S.C. § 507(a)(8)(e).

Appellant, Boston Regional Medical Center, ("BRMC or debtor") filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts.  Appellee, the Commonwealth of Massachusetts, by its Division of Health Care Finance and Policy ("HCFP"), filed a proof of claim.  After resolving a disagreement over the dollar amount, appellee finally asserted a priority of claim for $1,702,714, a sum representing appellant's unpaid prepetition obligations as an acute hospital under Mass. Gen. Laws ch. 118G, § 18 to the Commonwealth's Uncompensated Care Pool (the "Pool").[1]  While the debtor agreed to

---

[1]Mass. Gen. Laws ch. 118G, § 18 was added by 1996 Mass. Acts ch. 151, § 275, which repealed and replaced an earlier and substantially identical version of the same law, Mass. Gen. Laws ch. 118F, § 15.  The debt at issue relates to the years 1996 through 1999, so the earlier version of the statute is not pertinent.  Likewise, the numerous amendments to section 18 in the year 1996 and after do not affect our analysis.  1996 Mass. Acts ch. 203, § 18; 1997 Mass. Acts ch. 47, § 14; 1997 Mass. Acts ch. 170, § 27; 1998 Mass. Acts ch. 319, § 9; 1998 Mass. Acts ch. 463, § 100; 2001 Mass. Acts ch. 177, § 29; 2003 Mass. Acts ch. 26, §§ 353 to 359.  As the parties have stipulated to the facts pertinent to the operation of the statute, we need refer only to the stipulation, not to the particular statutes themselves.

the dollar amount of the claim, it disputed appellee's contention that the claim was entitled to priority as an "excise tax" under section 507(a)(8)(E) of the Bankruptcy Code.  Determining the claim was for an excise tax, the bankruptcy court overruled appellant's objection and granted priority to the claim.  In re Boston Reg'l Med. Ctr., 264 B.R. 222, 229-30 (Bankr. D. Mass. 2001) ("BRMC II").  Appellant appealed, and the district court affirmed the bankruptcy court's judgment, stating its reasons in the course of an unpublished bench ruling.  We affirm the district court.

## Facts

The case was submitted on stipulated facts, the substance of which are as follows.

Prior to filing its Chapter 11 bankruptcy petition, appellant, BRMC, owned and operated a 195-bed private, acute hospital in Stoneham, Massachusetts.  As an acute hospital[2] within Massachusetts, BRMC was required by Massachusetts law to participate in the Pool (Pool).[3]  The Pool, administered by the State's Division of Health Care Finance and Policy, is a fund from

---

[2]"Acute hospital" is defined as "the teaching hospital of the University of Massachusetts Medical School and any hospital licensed under section fifty-one of chapter one hundred and eleven and which contains a majority of medical-surgical, pediatric, obstetric, and maternity beds, as defined by the department of public health."  Mass. Gen. Laws ch. 118G, § 1.

[3]To maintain their licenses, every Massachusetts acute hospital must pay or credit to the Pool such as the law requires.  See In re Ludlow Hosp. Soc'y, Inc., 216 B.R. 312, 315 (Bankr. D. Mass. 1997).

which Massachusetts hospitals are paid or credited for the free health care they furnish to patients who do not have health insurance or cannot otherwise pay for hospital care. Mass. Gen. Laws. ch. 118G, §§ 18(h) and (k). The Pool's stated statutory purpose is "to provide access to health care for low income uninsured and underinsured residents of the Commonwealth."[4] Id. The Massachusetts Supreme Judicial Court has stated, in respect to an earlier version of the Pool law, that the Pool's purpose is "'to more equitably distribute the burden of uncompensated acute hospital services across all acute hospitals.'" Gen. Hosp. Corp., v. Rate Setting Comm'n, 552 N.E.2d 113, 114 (Mass. 1990) (quoting Mass. Gen. Laws ch. 6A, § 75).

Pool funding comes both from the mandatory assessments made against each acute hospital based on its "private sector charges," infra, and from other governmental funds and assessments. The amounts collected by the Pool are segregated for its own purposes and are not used to fund other governmental programs or otherwise to defray the costs of state government.

---

[4]This quoted language appears in the version of § 18 as amended by 1997 Mass. Acts ch. 47, § 14, an emergency act, approved July 11, 1997, and by 1997 Mass. Acts ch. 47, § 37, made effective Oct. 1, 1997. This portion of § 18 was again amended by 2003 Mass. Acts ch. 26, § 353, an emergency act, approved June 30, 2003, and by 2003 Mass. Acts ch. 26, § 715 made effective July 1, 2003, in subsec. (a), which substituted "is to reimburse hospitals and community health centers for care provided to low-income, uninsured and underinsured residents of the commonwealth" for "shall be to provide access to health care for low income uninsured and underinsured residents of the commonwealth".

-4-

Section 18 provides for the collection and distribution of Pool funds among the hospitals. According to section 18(e), a hospital's liability to the Pool is proportional to the amount of otherwise uncompensated care each hospital provides. Liability to the Pool (i.e., the assessment based on its private sector charges) "shall equal the product of (1) the ratio of its private sector charges to all acute hospitals' private sector charges; and (2) the private sector liability to the uncompensated care Pool as determined by law . . . ."[5] In order to determine the debtor hospital's individual liability to the Pool, the HCFP must, therefore, first determine the amount of private sector charges for all hospitals in Massachusetts. "Private sector charges" is defined as a hospital's gross patient service revenue, less the amount of gross patient service revenue that is attributable to Medicare, Medicaid and other "publicly aided patients, free care and bad debt." Mass. Gen. Laws ch. 118G, § 1.

In calculating a hospital's liability to the Pool, certain credits are provided. A hospital's assessed liability to the Pool is offset against the amount owed by the Pool to the

_____

[5]This quoted language appears in the version of § 18 as amended by 1997 Mass. Acts ch. 47, § 14, an emergency act, approved July 11, 1997, and by 1997 Mass. Acts ch. 47, § 37, which went into effect on July 11, 1997 and Oct. 1, 1997, respectively. Prior to these amendments, the language was as follows, "A hospital's liability to the pool shall equal the product of: (a) the ratio of its private sector charges; and (b) the private sector liability to the uncompensated care pool as determined by the general court."

hospital for uncompensated care during the same period, thus resulting in either a net liability to the Pool or a net distribution from the Pool. Mass. Gen. Laws ch. 118G, § 18(d). The Pool, therefore, charges the hospitals' collective private sector revenue to pay for the hospitals' collective burden of uncompensated care, resulting, at bottom, in a net transfer of revenue from those hospitals that provide less uncompensated care (as a proportion of the hospital's total patient service charges) to those that provide more. Mass. Gen. Laws ch. 118G, §§ 18(d) and 18(h). To the extent a hospital receives reimbursement for free care directly from Medicare, Medicaid or another source other than the Pool, the amount owed by all other hospitals is reduced because the amount of funding required from the Pool is reduced.

Furthermore, "disproportionate share hospitals" -- which are hospitals that have "a payer mix where a minimum of sixty-three percent of the acute hospital's gross patient service revenue is attributable to [certain government payments] and free care" -- and "non-disproportionate share hospitals" -- which do not have that payer mix -- receive different treatment under section 18. Mass. Gen. Laws ch. 118, § 1. In the event that the Pool does not have sufficient funds to reimburse all hospitals for all of the free care provided, the amount paid from the Pool is weighted towards disproportionate share hospitals.

Pursuant to section 18, BRMC owes appellee a total of $1,702,714, representing the total amount due to the Pool for the following fiscal years:

a.      1996 - $1,580,506

b.      1997 - $   60,639

c.      1998 - $  (77,744) credit

d.      1999 - $  139,313

The bankruptcy court concluded that the foregoing total Pool claim was entitled to priority as an excise tax, thus giving rise to the single issue presented in the current appeal. BRMC II, 264 B.R. at 229-30.

### Present Contentions and the Opinions Below

As it did below, the appellant now argues that the claim for the Pool assessment owed by BRMC is not for an "excise tax," thus not entitled to priority, under § 507(a)(8)(E) of the Bankruptcy Code. In BRMC's view, the bankruptcy and district courts failed to engage in an adequate "functional analysis" of the nature of the statutory assessment underlying the Pool claim. BRMC contends that the Pool statute is in form and function merely a risk sharing plan imposed on acute hospitals -- a plan, that, instead of being a tax, is really only a regulatory fee imposed for the privilege of operating an acute hospital in Massachusetts.

In response, appellee argues that the mandatory exaction placed by Massachusetts law upon the state's acute hospitals is a

tax, having been legislatively established to raise monies to advance the public purpose of promoting continued access to acute hospital services by low-income uninsured and underinsured residents of Massachusetts.

In ruling that the Pool assessment is a tax, not a fee, the bankruptcy court similarly laid particular emphasis upon the exaction's public purpose -- the promotion of hospital access to low-income uninsured and underinsured residents of Massachusetts. BRMC II, 264 B.R. at 225. That, coupled with its involuntary character and its other functional attributes, was found to differentiate it from a regulatory fee. Id. at 225-30.

In affirming the bankruptcy court's opinion, the district court stated from the bench that the bankruptcy court's reasoning was persuasive with "one possible exception." The court said the mere fact that the Pool exaction was paid in order to serve the public welfare would not necessarily demonstrate it was an excise tax. Almost everything paid to the government, the court suggested, is intended for a public purpose. Here, however, the court found the exaction to be targeted specifically at paying for medical care for members of the public unable to pay for themselves. Unlike the case of a driver's license or other fee, the money is not collected by the government simply to confer a benefit on the payer or to pay itself for a government service rendered to the payer. "Functionally and under the so-called

<u>Suburban</u> factors, this is a tax," the district court said. Further, the tax is an excise, the court continued, citing a definition found in Black's Law Dictionary.[6]

## Discussion

At issue is whether the assessments for the Uncompensated Care Pool imposed upon appellant under state law constitute "excise taxes" and, therefore, are entitled to priority under section 507(a) of the Bankruptcy Code. This is a federal question. <u>City of New York</u> v. <u>Feiring</u>, 313 U.S. 283, 285 (1941); <u>State of New Jersey</u> v. <u>Anderson</u>, 203 U.S. 483, 491 (1906). The parties have stipulated to the facts, leaving only the application of the statute, a matter we examine on appeal de novo. <u>Commonwealth of Mass. Div. of Employment and Training</u> v. <u>Boston Regional Med. Ctr., Inc. (In re Boston Reg'l Med. Ctr., Inc.)</u>, 291 F.3d 111, 119 (2002) ("<u>BRMC I</u>").

Provisions that grant priority in bankruptcy are to be narrowly construed. <u>See</u> <u>Cramer</u> v. <u>Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)</u>, 536 F.2d 950, 953 (1st Cir. 1976) (stating, "We begin with the premise that the theme of the Bankruptcy Act is

_____

[6]The district court stated:
Black's Law Dictionary, the 7th edition, page 585, defines an excise tax as a tax imposed on the manufacture, sale, or use of goods, or on an occupation or activity. Since the tax here is a tax that is levied as a result of operating the hospital and measured by a hospital's share of industry's revenues, it is an excise tax, I find, as opposed to a tax of some other sort.

-9-

'equality of distribution.' 'If one is to be preferred over others, the purpose should be clear from the statute.'") (quoting Nathanson v. NLRB, 344 U.S. 25, 29 (1952)); see also Northwest Fin. Express, Inc. v. JWD, Inc. (In re Northwest Fin. Express, Inc.), 950 F.2d 561, 563 (8th Cir. 1991).

Section 507(a) sets forth in descending order nine categories of priority claims. Appellee's claim for priority status is stipulated to be based solely upon its being an "excise tax" under § 507(a)(8)(E), the eighth category. The relevant language reads as follows:

> **§ 507.    Priorities.**
> (a) The following expenses and claims have priority in the following order:
> . . .
> (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for --
> . . .
> (E) an excise tax on --
> (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or
> (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition;

The parties do not question that appellee is a governmental unit, that it holds an unsecured claim, that the claim relates only to transactions occurring before the date of the filing of the petition, and that the three-year limitation does not bar the

claim. In dispute is only whether the claim is for an "excise tax." Unless so, the claim is without priority.

The Bankruptcy Code does not define "excise tax," nor is the legislative history informative on what the term means. BRMC I, 291 F.3d at 120. We turn, therefore, to the relevant interpretive case law. See BRMC I, 291 F.3d at 120 (citing United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 224 (1996)). The discussion in the cases has mostly concerned the meaning of the term "tax," with little attention paid to the term "excise." See, e.g., CF & I, 518 U.S. at 224-26 (relying on precedent concerning definition of "tax" and concluding that the obligation at issue was a "penalty" rather than a "tax" and, therefore, that the obligation was not entitled to priority as an "excise tax"); Workers' Comp. Trust Fund v. Saunders, 234 B.R. 555, 560 n.8 (D. Mass. 1999); In re Park, 212 B.R. 430, 434 (D. Mass. 1997) (noting that courts do not often engage in analysis of the "excise" portion of the phrase "excise tax" once an exaction has been determined to be a "tax").

The Supreme Court has defined taxes as "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." Feiring, 313 U.S. at 285-88; see also Anderson, 203 U.S. at 492; BRMC I, 291 F.3d at 120. This definition is sometimes called the "Feiring-Anderson" standard. CF

& I, 518 U.S. at 222 n.6. The Court has added that courts should look beyond the statutory label of an exaction and evaluate its "actual effects" to determine whether it functions as either a tax or else as some different kind of obligation, like a debt, fee, or penalty. CF & I, 518 U.S. at 221, 224-25; see also BRMC I, 291 F.3d at 120.

The lower courts have often struggled in applying the Feiring-Anderson analysis to debts in a bankruptcy setting. Some courts have asked whether the tax characteristics of a state-imposed exaction outweigh its non-tax characteristics. In re Chateaugay Corp., 153 B.R. 632, 641 (Bankr. S.D.N.Y. 1993); Bell v. Brown (In re Payne), 27 B.R. 809, 817 (Bankr. D. Kan. 1983). Others have asked whether, regardless of non-tax characteristics, there are sufficient tax attributes to call the exaction a tax. See, e.g., Waldo v. State of Montana Dept. of Labor and Industry Uninsured Employers Fund (In re Waldo), 186 B.R. 118, 125 (Bankr. D. Montana) (1995) (stating, "[t]herefore since all elements of the [list of tax characteristics] are fully satisfied by the UEF's claim against Debtor, Debtor's obligation is in the nature of a tax for purposes of the Bankruptcy Code, specifically 11 U.S.C. § 507(a)(7)(E)."). Some courts have also sought to give particular and separate weight to the Bankruptcy Code's principle of equal distribution of the debtor's estate. See, e.g., Workers' Comp. Trust Fund v. Saunders, 234 B.R. 555, 565-67 (D. Mass. 1999); see

also Begier v. Internal Revenue Service, 496 U.S. 53, 58 (1990) (stating "Equality of distribution among creditors is a central policy of the Bankruptcy Code.").

Given the difficulty of applying Feiring-Anderson's general definition of a tax to the unusual state exactions sometimes encountered in a bankruptcy context, "courts have formulated additional criteria for determining when a governmental claim is entitled to priority treatment." In re United Healthcare Sys., Inc., 282 B.R. 330, 335 (Bankr. D. N.J. 2002). Foremost among these has been the multi-factored test developed in the Ninth and Sixth Circuits known as the Lorber/Suburban II analysis. County Sanitation v. Lorber Indus. of California, Inc. (In re Lorber Indus. of California, Inc.), 675 F.2d 1062, 1066 (9th Cir. 1982); Ohio Bureau of Workers' Comp. v. Yoder (In re Suburban Motor Freight, Inc.), 36 F.3d 484, 488 (6th Cir. 1994) ("Suburban II"). The bankruptcy court below relied heavily upon a Massachusetts bankruptcy decision that applied Lorber/Suburban II to the Pool exaction here. BRMC II, 264 B.R. at 226 (citing In re Ludlow Hosp. Soc'y, Inc., 216 B.R. at 318-20). The district court seemed largely content with that approach.

In Lorber, the Ninth Circuit held that, to qualify as a tax, an exaction must be: (1) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (2) imposed by, or under authority of the legislature; (3) for public purposes,

-13-

including the purposes of defraying expenses of government or undertakings authorized by it; and (4) under the police or taxing power of the state. Lorber, 675 F.2d at 1066. In Suburban II, the Sixth Circuit expressed concern over the adequacy and possible one-sidedness of Lorber's "public purpose" prong, and it added two additional factors of its own, namely (5) whether the exaction is universally applied to all similarly situated entities and (6) whether the granting of priority status to a governmental claimant would prejudice private creditors with like claims. Suburban II, 36 F.3d at 488-89; see also BRMC I, 291 F.3d at 121 n.10 (sharing Suburban II court's concern that Lorber, by itself, was "incomplete and one-sided, and may lead to incorrect results.") (citing Suburban II, 36 F.3d at 488-89; Indus. Comm'n v. Camilli (In re Camilli), 94 F.3d 1330, 1333-34 (9th Cir. 1996) (holding the Suburban cases consistent with Lorber and following the Sixth Circuit's reasoning)).

Debtor contends the Supreme Court implicitly rejected the Lorber/Suburban II standard in United States v. Reorganized CF & I Fabricators of Utah, Inc., a case decided after the Ninth and Sixth Circuits' decisions in Lorber and Suburban II. In CF & I, the Court made no mention of Lorber or Suburban II. Rather, it emphasized the "continuing vitality of the cases in the Feiring line." CF & I, 518 U.S. at 222. But Lorber and Suburban II undertook to apply the principles stated in the Feiring line, and

-14-

we see nothing in CF & I that renders those circuit precedents no longer useful constructs.  We faced this issue recently in BRMC I, holding that Lorber and the Suburban cases remained persuasive after CF & I.  We said in BRMC I:

> The BAP treated Anderson and [Feiring] on the one hand, and Lorber and the two Suburban cases on the other, as developing different and apparently mutually exclusive tests.  It then concluded that the Supreme Court had chosen the former test rather than the latter in CF & I.  We consider Lorber and the Suburban cases to be refinements of the law generated in Anderson and Feiring, which remain persuasive to although not binding on this court after CF & I.

BRMC I, 291 F.3d at 121 n.10 (citations omitted).  The Lorber/Suburban II approach therefore remains an available tool of analysis, although, of course, subject at all times to the overarching authority of Feiring and Anderson.  See, e.g., San Juan Cellular v. Public Serv. Comm'n of Puerto Rico, 967 F.2d 683, 684-687 (1st Cir. 1992) (utilizing an approach that approximated the first three prongs of Lorber); In re Ludlow Hosp. Soc'y, Inc., 216 B.R. at 319 (stating, "This Court disagrees with the Trustee's assertion that [San Juan Cellular] represents an approach different from what appears to be a well-settled line of cases commencing with Feiring.  Notwithstanding the fact that San Juan Cellular was decided under the Tax Injunction Act, we find the thoughts expressed by the panel in San Juan Cellular virtually indistinguishable from those expressed by the Ninth and Sixth

-15-

Circuits in Lorber and Suburban II, both decided under the Bankruptcy Code."). Many other courts have found Lorber/Suburban II to be consistent with, and useful in applying, the controlling Feiring-Anderson rationale. See In re Cassidy, 983 F.2d 161, 163 (10th Cir. 1992); Indus. Comm'n of Ariz. v. Camilli (In re Camilli), 94 F.3d 1330, 1331-32 (9th Cir. 1996), cert. denied, 519 U.S. 1113 (1997); In re Park, 212 B.R. 430, 433-34 (Bankr. D. Mass. 1997); Sacred Heart Hosp. v. Penn. Dep't of Labor and Indus. (In re Sacred Heart Hosp.), 209 B.R. 650, 654-58 (E.D. Pa. 1997); In re Chateaugay Corp., 177 B.R. at 637-38; In re S.N.A. Nut Co., 188 B.R. 392, 393-94 (Bankr. N.D. Ill. 1995).

Accordingly, in considering the term "tax" here, we avail ourselves of the analytical approach set out in Lorber/Suburban II. In doing so, we find ourselves in essential agreement with the similar application of Lorber/Suburban II in In re Ludlow Hosp. Soc'y, Inc., as adopted by the bankruptcy court below. BRMC II, 264 B.R. at 226 (citing In re Ludlow Hosp. Soc'y, Inc., 216 B.R. at 318-20).

## 1. Involuntary Burden

We ask first whether the Pool exaction was an involuntary pecuniary burden. Lorber, 675 F.2d at 1066. The Lorber court explained that an "involuntary pecuniary burden" was a "non-contractual obligation imposed by state statute upon taxpayers who had not consented to its imposition." Id. (citing Dungan v. Dept.

of Agric., State of Calif., 332 F.2d 793 (9th Cir. 1964), aff'g In re Farmers Frozen Food Co., 221 F. Supp. 385 (N.D. Cal. 1963)). The exaction here was imposed by statute; it was neither consented to, nor part of a contract. It was thus an involuntary pecuniary burden.

Appellant argues that the assessment was nonetheless voluntary because each acute hospital could to some degree regulate its obligation to the Pool by choosing to provide more or less free care. However, acute hospitals within the ambit of Mass. Gen. Laws ch. 118G, § 18 have no legal option but to pay or credit such assessments as are due. And even if appellant enlarged the quantum of free care it provided, it could not be certain to avoid liability. An acute hospital's liability is based, in part, upon the amount of free care that all other acute hospitals in the state have provided for that same year -- an unpredictable amount. The only way appellant could be certain to avoid sharing in the burdens of the Pool would be to cease all acute care operations. See In re Suburban Motor Freight, 156 B.R. 790, 792 (S.D. Ohio 1992) (concluding that the statute insurance scheme in favor of private insurance was involuntary since employers were not permitted to opt out and rejecting argument that scheme was voluntary because employers could choose not to be under it by refusing to conduct business in the state). By appellant's rationale, the federal income tax would not qualify as a "tax" because the taxpayer may

voluntarily minimize his or her tax liability by earning less income or by taking advantage of deductions. <u>See, e.g.</u>, <u>In re Sacred Heart Hosp.</u>, 212 B.R. at 474 (stating, "All taxes may be avoided by a 'choice' of the taxpayer").

### 2. Exaction Imposed Under State's Authority

Secondly, there is no dispute the Pool exaction is imposed under the authority of the Massachusetts legislature. <u>Lorber</u>, 675 F.2d at 1066.

### 3. Exaction Was For A Public Purpose

Thirdly, the Pool exaction is for a public purpose, i.e. for the defraying of expenses or undertakings of a type commonly assumed by the government -- namely, those providing free health care to persons without the resources to pay for it. <u>Lorber</u>, 675 F.2d at 1066. There is no correlation between what a hospital pays and the receipt in return of some particular service. Rather, the hospital is obliged, based on an equitable formula, to help fund hospitals around the state that serve indigent members of the public, thus enabling Massachusetts to provide free care to residents. Disproportionate share hospitals rely on Pool funds to remain in business.[7] While acute hospitals are the exclusive recipients of these funds, the amount each receives relates to the

_____

[7]While the Pool benefits disproportionate share hospitals by assisting with their reasonable financial requirements relative to caring for indigent patients, the statutory formula does not allow hospitals to profit from Pool funds. Mass. Gen. Laws ch. 118G, §§ 1 & 18A.

-18-

amount of free public services each provides.  Under the statutory

scheme, individual hospitals serve as conduits through which the

Pool channels funds to pay for the free care rendered to uninsured

or underinsured patients.  This court stated in San Juan Cellular,

967 F.2d at 685, that "[c]ourts facing cases that lie in the middle

of this spectrum have tended (sometimes with minor differences

reflecting the different statutes at issue) to emphasize the

revenue's ultimate use, . . . ."[8]  The "ultimate use" here is a

valid governmental purpose -- one specifically identified in the

relevant Massachusetts statute.  See Mass. Gen. Laws Ch. 118G, §

18.

Appellant argues that the exaction does not defray costs

of the Commonwealth because the Pool merely spreads the cost of

care among the acute hospitals.  It further notes that the funds of

the Pool are segregated from other state revenues and not used to

fund other governmental operations of the Commonwealth of

Massachusetts.  According to appellant, the exaction is merely to

defray costs and provide benefits to hospitals participating in the

program rather than to the Commonwealth and the general public.  In

---

[8]It is true that "all money collected by the Government goes towards defraying its expenses, and is used for public purposes." Yoder v. Ohio Bureau of Workers' Comp. (In re Suburban Motor Freight, Inc.), 998 F.2d 338, 341 (6th Cir. 1993).  We need not be concerned here, however, because the connection between the Pool payments and the recipient of free care is not tenuous -- the funds are given in direct relation to the amount of free care provided. Mass. Gen. Laws. ch. 118G, §§ 1 &18A.

support of this argument, appellant analogizes the Pool to the Unemployment Compensation Fund in BRMC I. We disagree. In BRMC I, we concluded that the fund scheme was not a tax because, among other reasons, "The distinction between the payments required to sustain a government undertaking as a whole and those required merely to compensate for the costs imposed by a particular participant is significant." 291 F.3d at 122. Here the payments to the Pool are geared to sustain, as a whole, the stated governmental undertaking of providing access to health care for low-income uninsured and underinsured residents of the Commonwealth. Accordingly, these costs are distinguishable from the costs in BRMC I.

Nor is the Pool analogous to the Unemployment Compensation Fund. To be sure, the Pool operates as a sort of risk sharing plan, but that does not preclude it from satisfying the public purpose requirement. See Williams v. Motley, 925 F.2d 741, 745 (4th Cir. 1991) (pool of funds to be distributed among all of the state's automobile insurers to compensate for uninsured drivers was a tax, not a regulatory fee, because the pool's purpose was to benefit the general public by reducing the overall costs of uninsured motorist insurance coverage). We have expressed a willingness to declare such fund-type mechanisms "taxes." See San Juan Cellular Tel. Co., 967 F.2d at 685 (stating, "Or, [a tax] may serve such purposes indirectly by, for example, raising money

-20-

placed in a special fund to help defray the agency's regulation-related expenses.").

### 4. Pool Assessment Imposed Under Police Or Taxing Power

Fourthly, there is no dispute that the Pool assessment was imposed pursuant to the Commonwealth's police or taxing power. Lorber, 675 F.2d at 1066.

### 5. Assessment Uniformly Applied To All

Fifthly, the Pool assessment is uniformly applied to all similarly situated entities. Suburban II, 36 F.3d at 489. The debtor argues that since the Pool statute favors disproportionate share hospitals, it is not uniformly applied. It points out that hospitals providing a disproportionate amount of free care receive the most benefit from the Pool. For example, after years where there is a deficiency in the Pool, those disproportionate share hospitals with the greatest proportional requirement for Pool income have to pay less of a share into the Pool than do the other hospitals. Also, in the event that the Pool does not have sufficient funds to reimburse all hospitals for all of the free care provided, the amount paid from the Pool is weighted towards disproportionate share hospitals. However, all acute hospitals are subject to the same rules; all similarly situated hospitals are treated alike. See, e.g., Ludlow Hosp. Soc'y, Inc., 216 B.R. at 320 (finding that Pool satisfied requirement that the assessment be universally applied to similarly situated entities because the

-21-

obligation to participate in the Pool is "universally imposed on all acute hospitals in the Commonwealth").  Under the Pool assessment scheme, acute hospitals with the same financial profiles in any given year will have the same liability in the Pool.  Boston Reg'l Med. Ctr., 264 B.R. at 227.  Under debtor's reasoning, the federal personal income tax, which treats people with different incomes differently, would not constitute a tax.  We conclude the exaction here is applied uniformly to similarly situated entities.

### 6.  No Prejudice To Private Creditors

Lastly, under the final Lorber/Suburban II factor, we consider if granting priority to the Pool assessment would prejudice private creditors with like claims.  Suburban II, 36 F.3d at 489.  The Suburban II court framed this sixth requirement because it was concerned that private actors who might, in some cases, perform the same function as the government would be given inferior priority.  Suburban II, 36 F.3d at 488 (stating "*If the State had an optional participation program, or allowed employers to purchase private liability insurance, it would be unfair and without statutory justification to call state-collected premiums 'taxes' and put the Bureau ahead in line while leaving unpaid private insurers to languish along with the rest of the unsecured creditors.*") (quoting Suburban I, 998 F.2d at 342) (emphasis supplied) (citations omitted).

The bankruptcy court determined there were "no private creditors with claims sufficiently similar to [appellee's] who would suffer any disadvantage by conferring priority treatment to a Pool claim." We agree. Appellant points to no private creditor with a role comparable to appellee's. No private entity with power to require hospitals to contribute to a fund for the sake of preserving free care for the indigent has been identified. See Camilli, 94, F.3d at 1334. Instead, appellant seeks to switch the argument to the purported lack of injury to appellee if it does not receive priority as a creditor. According to appellant, appellee state agency (rather than the hospitals themselves) will suffer no loss in any event. Supposedly this indicates the exaction is a regulatory fee. This argument, however, ignores the loss to the government's program, aimed at furnishing free hospital services to the public, if the assessment is unpaid. The argument, moreover, is beside the point; as it focuses on the purported lack of harm to the government creditor rather than on whether granting priority to the Pool assessment will prejudice a private creditor. As appellant's argument has nothing to do with the government's position in relation to similarly situated private entities, it is not germane.

We conclude that the Pool assessment satisfies all of the Lorber/Suburban II criteria for a tax. Appellant, however, argues that a court must additionally inquire whether the non-tax

characteristics, particularly the regulatory fee characteristics, of the exaction outweigh the tax characteristics. Since the Lorber/Suburban II criteria were developed to subsume that inquiry, we arguably need not entertain it. But because the exercise is illuminating, we take it on, finding that it leads to the same result as was reached under Lorber/Suburban II.

Regulatory fees have been defined as "monies paid to the government incident to a voluntary act that bestows a benefit on the applicant, not shared by other members of society." N. Dakota Workers Comp. Bureau v. Voightman (In re Voightman), 239 B.R. 380, 383 (8th Cir. 1999); see also Nat'l Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 340-41 (1974) (defining regulatory fees same way in non-bankruptcy context). Similarly, in San Juan Cellular, we approved of the approach utilized by other courts, which -- in distinguishing a tax from a regulatory fee -- focused on the "revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides a more narrow benefit[] to regulated companies or defray[s] the agency's cost of regulation." 967 F.2d at 685. The ultimate design and use of the exaction here are to help finance the provision of hospital care to people unable to pay for it themselves. While specialized and somewhat intricate, it finances a general benefit to the public of a kind that could properly have been financed from more ordinary tax

-24-

revenues. Per contra, the Pool scheme is not aimed at bestowing a narrow benefit upon the payer hospital, nor defraying the cost of regulation. We conclude the exaction is a tax.

Appellant makes various other arguments not so far addressed. We briefly discuss some of them, finding none to have merit.

Relying on BRMC I, appellant argues that since appellee, itself, does not have to pay any shortfall in the Pool, it is not an involuntary creditor.[9] In BRMC I, we stated that "[o]ne of the important reasons for giving special priority in bankruptcy to taxes is that state and federal governments do not generally choose their tax debtors." 291 F.3d at 123. Taxing authorities receive priority treatment because, inter alia, they are "involuntary creditor[s] of the debtor," who are unable to "take security in advance of the time that taxes become due." Id. In concluding that the exaction in BRMC I was not a tax, we noted the law would have allowed the Commonwealth to have required BRMC to post a surety to secure its anticipated future liability to the fund at

---

[9]If we are to understand appellant's argument as a claim that appellee is not a creditor, let alone an involuntary creditor, it nevertheless fails. Appellant has stipulated that it owes appellee $1,702,714. Accordingly, appellee is a creditor. 11 U.S.C. § 101 (defining "creditor," inter alia, as "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor," and defining "claim," inter alia, as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.").

issue.  Here, however, appellee has no authority to require security in advance.  Its remedies are ex post facto.  Upon non-payment by an acute hospital, appellee can only then either re-calibrate the Pool in accordance with the statutory formula for the next year or choose, for example, to refuse to renew the expired licenses of a defaulting acute hospital.  The appellee cannot be said, therefore, to choose its debtors, nor is appellee other than an involuntary creditor.  Id.

On a different tack, appellant contends that for an exaction to be a tax, the statute must provide the government with an automatic lien to secure payment.  The existence of an automatic lien provision was one of several attributes of a tax listed by the bankruptcy court in Park and Columbia Packing.  However, the absence of such a lien was not said to prevent an exaction from being a tax.  Here, appellee has different remedies at its disposal, including the ability to offset payments due to the defaulting hospital's Medicaid claims.  BRMC II, 264 B.R. at 225, 228 (citing Mass. Gen. Laws ch. 118G, § 18(g)).  Appellant's argument in this regard seems inconsistent with our statement in BRMC I that the absence of pre-default security for payment would militate in favor of finding a priority claim.  BRMC I, 291 F.3d at 123.

Appellant also argues that the amount of an exaction must be fixed by statute in order to qualify as a tax and that, since

the amount of the assessment here varies depending on the amount of free care given by all acute hospitals, the exaction is not sufficiently fixed by statute.  In support of this claim, appellant relies solely on In re Freymiller Trucking, Inc..  There, the Bankruptcy Court for the Western District of Oklahoma stated, "I am unable to think of a 'tax' . . . that is not based on a percentage of something, be it income, sales, corporate capital, or the value of property, a gift or inheritance."  194 B.R. 914, 915 (Bankr. W.D. Okla. 1996).  In concluding that a tax assesses at a "fixed rate," the Freymiller court principally relied on Anderson, in which the Supreme Court required that the amount of tax be fixed by statute.  Id.

However, the Anderson court did not state that a tax must be based on a percentage, as the Freymiller court and appellant suggest.  Rather, the Anderson court sought to determine whether the debt had arisen from a contract with the government as opposed to being a tax.  203 U.S. at 492-93.  Since the government had fixed the amount of tax in a statute, the debtor was unable to negotiate the amount of the tax, and the Court determined that the exaction was a tax rather than a contract with the government.  Anderson, 203 U.S. at 493 (stating, "But this imposition is in no just sense a contract.  The amount to be paid, fixed by the statute, is subject to control and change at the will of the state . . . .  The corporation is not consulted in fixing the

-27-

amount of the tax, and under the laws of New Jersey the charter of such corporations as this may be amended or repealed. The form of the collection of taxes is left to the discretion of the taxing power . . . ."). Thus, the Court's use of the term "fixed by statute" seems to have meant merely that the exaction is based on an amount determined by the government through statute. Id. Here, the amount of the exaction has been determined by a statutory formula, so the exaction satisfies the requirement.

Appellant also appeals to equity, arguing that granting priority treatment to appellee would contravene the "fundamental bankruptcy principal of equality of distribution among creditors." See Boston Reg'l Med. Ctr., 256 B.R. 212, 218 (Bankr. D. Mass. 2000). In support of this argument, appellant reiterates the contention that the Commonwealth does not, itself, suffer a loss because any loss ultimately passes only to the acute hospitals. However, the hospitals are the instruments of the government's intended services to indigents: losses to them impact adversely the public program, which the legislature and state government entrusted to appellee to administer. We can see no difference between the equities here and those that support the granting of priority to other taxes.

Finally, we ask whether this tax fits within the term "excise tax." 11 U.S.C. § 507(a)(8)(E). In another case, we have quoted Black's Law Dictionary to the effect that, "[a]n excise tax

is '[a] tax imposed on the manufacture, sale, or use of goods . . . or an occupation or activity . . . .'" United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 326 n.1 (1st Cir. 2003) (quoting Black's Law Dictionary at 585 (7th ed. 1999)).  The tax here can be said to be levied on the Massachusetts acute hospital industry, using an overall formula to determine each hospital's share.  Like the district court, we think it fits sufficiently within the broad definition of an excise.  We hold appellee's claim is entitled to priority treatment as an "excise tax" pursuant to 11 U.S.C. § 507(a)(8)(E).

**Affirmed.**